Page 125-6473. Chamber of Commerce of the United States of America and Associations of American Universities, Accounts, versus United States Department of Homeland Security, et al. Mr. Yunikovsky for the Accounts, Mr. Davis for the Appellees. Morning. Morning, Your Honors. May I proceed? Yes. Thank you, Your Honors. My name is Adam The Supreme Court's decision in Learning Resources confirms that the proclamation is contrary to law, but was a close and difficult case when Judge Howell decided it is a straightforward case today. Learning Resources reinforces both that the authority to restrict the entry of aliens into the United States does not encompass the authority to impose a tax, and that the proclamation is incompatible with other provisions of the INA that fix the cost of filing an H-1B petition at a far lower amount. So the IEPA and Section 212F are strikingly similar statutes. The IEPA confers the President with very broad discretion to prevent or regulate the entry of property into the United States. So in that sense, it's quite similar to Section 212F, which confers the President with broad discretion to restrict or suspend the entry of foreign nationals into the United States. And the IEPA is extremely broad. First, it applies only in cases of unusual and extraordinary threats, which is a discretionary standard that the Executive has said is so broad as to be not justiciable. The President can choose the means by which he exercises authority. It says the President may act, quote, by means of instructions, licenses, or otherwise. So that's a very broad grant of discretion. And it includes nine separate powers that really cover the waterfront of all the different ways the President might want to regulate or prevent property from entering the United States. But if we're comparing 1182F to IEPA on the one hand, which, of course, you want to do to make this case as close to learning resources as possible, but we could also compare it to the statute at issue in Algonquin. And that which learning resources distinguished said the Algonquin statute is a broad discretionary conferring provision on the President. That statute said allowed the President to take such other action as he deems necessary. And 212F to me reads more like that statute than like IEPA. A couple of things about that statute, if I may, Your Honor. First of all, that statute does give the President broad discretion as well, but it's discretion to adjust importation. And the core of the Court's reasoning in Algonquin is that adjustment implies a kind of fine and granular change to the amount of importation that could be effectuated via what was characterized as license fees in that case. I'd also point out that crucial to the learning decision was that Section 232A, which was the preceding part of the Trade Expansion Act, specifically referred to duties. And so the Court drew a structural inference that the ability to adjust imports also encompassed these license fees. And if I can just put one other point on the table about this, you know, the Supreme Court's decision in learning resources had language saying that we expressly declined to extend the reasoning of Algonquin any further. I kind of IEPA is broad, but I mean, IEPA has a bunch of verbs like regulate, prohibit, compel, and the reasoning and learning resources focusing mainly on regulate is the power to regulate is not the power to tax. Your Honor, I'd say the same thing about the power to restrict not being the power to tax, especially given the, I'm sorry. He has the power to impose any restrictions he may deem appropriate as construed in Trump versus Hawaii exuding deference to the President in every part of that clause. Well, I don't think that Trump versus Hawaii considered this unique taxation issue. And you know, IEPA exudes deference to the President either, I mean, by means of instructions, licenses, or otherwise. I actually also think that the argument just focusing on the language of IEPA was stronger for tariffs in IEPA than the argument the government advances today. Because first of all, in IEPA, the second E in IEPA stands for economic. It's the International Emergency Economic Powers Act, which is at least redolent of the authority to, you know, issue economic tools such as tariffs. Also, the IEPA refers to instructions, licenses, or otherwise. So, you know, the word license at least seems to arguably convey the authority to impose license fees, which is exactly what was at issue in Algonquin. In this case, there's really nothing at all suggesting any authority to impose tax, just the word restrict. Plus, you know, I think that the molten core of the reasoning in learning resources was that there has to be express and clear language about taxation. The court uses the adverb expressly twice and uses clearly once. So if the president had proclaimed that this class of visa applicants would have to pay an additional $500 fee over and above the standard fee, does that violate the Constitution? Are you a constitutional argument? I probably would say that it's the type of tax that the president is an authorized issue under Section 1182. There are other authorities. There's the 1356M authority that allows the secretary to recharge a fee corresponding to the cost of the service. And, you know, there are some fees that are in that order that have been imposed pursuant to that express statutory authority. But I wouldn't say that Section 1182F would authorize the $500. So that would be my answer to your question, Your Honor. Well, I'm trying to understand, like, the argument you seem to be making is a statutory construction argument. So why does it matter how much the fee is? You're saying that restrictions can never be fees, or they can be fees if they're only, you know, so much. And then how do we know how much is too much? And why does the construction of the word, the breadth of the word restrictions, why does that even depend on how much the fee is? It doesn't, Your Honor. I think our argument based on learning resources is that restriction doesn't cover the ability to impose a tax. I don't think learning resources would have come out differently if the tariffs were lower. Under the Federal Circuit's reasoning in that case, it might have come out differently because the Federal Circuit focused on the size of the tariffs. But that was not how the Supreme Court understood the issue. The Supreme Court just seemed to say there's got to be clear and express language if you want to have a tax. And there just isn't. And therefore, the President's authorities under, i.e., if I don't extend the tax. But I thought your answer to my question, if it was a $500 fee, was that it wouldn't be a tax. You're saying it would be a tax? So the court, so it might be permissible under Section 1356M if the Secretary, pursuant to notice in common rulemaking, imposed such a fee for the cost of service. That's just a separate font of authority. I mean, I want to clarify my answer. Under Section 1182F, I don't think the President could impose that. Let's talk about two other powers in this case besides tax, right? If this is just a tax, that's helpful to you. But Congress has non-tax authorities under Article I, Section 8 that would easily justify the action here, here, immigration power, right? So what does it matter if this, this might or might not be a proper exercise if done by Congress, if the Article I, Section 8, Clause 1, powered a tax, if it's just independently justified under the immigration power? And in cases that are close to the intersection of things that might look like taxes but are restrictions on entry, I mean, the best case on that is the head money case. And that case says that the per head exaction in that case was an exercise of immigration power, not the tax power. I think a similar argument could have been made in learning resources itself, because the tariffs could arguably have been conceptualized as an exercise of the authority to regulate foreign commerce, as opposed to the authority to impose a tax. But nonetheless, the court conceptualized requiring people to pay to import goods as in its own category, as fundamentally or at least sufficiently different from the authority to regulate foreign commerce that at least some clear languages need. I mean, why would that be? If it's independently justified under another power, the argument that there are special constraints governing the tax power just loses its force. I'm not sure it does, because the ability to impose tax grants entire new vistas of authority to the executive branch. And I understand learning resources to say that if Congress wanted to delegate that authority, then it had to say so with more clarity than just general authority to regulate. I think that if so, what about I mean, what about head money, we have we have a case of the intersection of taxing power and the immigration power. And the court, I mean, it seemed to maybe say it's that that exaction couldn't even be justified as a tax, but it clearly says it can be justified as an exercise of the immigration power. I would view that as different from the statutory interpretation question. In this case, I think learning resources is more on point. I mean, we can have a debate over, you know, constitutional authority to issue a rule. But in this case, we're making a statutory interpretation argument. Our argument is definitely informed by... I get that. But the interpretive principle that you're pressing on us just seems to flow from the special, uniquely dangerous nature of the taxing power. I think learning resources says the taxing power has that character. Well, it doesn't address the immigration power. Well, let me put some other arguments on the table, because, you know, other ways in which I think our case is stronger than learning resources is not just the fact that this is a tax and the word restrict doesn't cover tax. There's other inferences from the statute in history. I'd just like to spend a couple of minutes, if I may. Can I put one more on the table to see how I'm thinking about it, which is, for me, the immigration power cuts against you and also the president's inherent... The Article I immigration power cuts against you, also the president's inherent Article II power to control entry. We know that he has that from Knopf against Shaughnessy. And there are lots of cases that say that when Congress is delegating to the president authority that he already has under Article II, that informs... We should take that into account in construing the scope of the delegation. Okay, so let me address those points in reverse order. If I could start with the Article II issue in Knopf. I'm not sure the president has the inherent Article II authority to impose fees based on the entry, even if the president has the inherent authority to exclude, which was discussed in Knopf. And I actually think there's a close analogy to AIPA here. So I think that in core applications of AIPA, there really is a concurrent power between Congress and the executive branch. The core application of AIPA is that the president perceives an unusual and extraordinary threat based on property entering the United States and closes the borders to make sure that property doesn't enter. So it seems to me that there's just a core executive power that doesn't require an act of... I agree with you, but learning resources was decided on the assumption that there was no inherent Article II power at issue. No, I think that the core... There was core applications of AIPA that would implicate the power. I think the premise of learning resources is that the specific power claimed by the president in that case, which is the power to impose tariffs, was not within the president's inherent Article II power, even if other applications of AIPA might be. And I think that's exactly what's happening here. I agree that there's language in Shaughnessy, or Knopf, excuse me, that suggests that some applications of the president's power to exclude dangerous individuals might arise from the president's Article II authority. But in this case, the president is claiming the power to tax, you know, to essentially tax importation. I use that term intentionally because Section 1184C, which addresses the petitions at issue in this case, refers to the petition of an importing employee, refers to the importation of an alien. So just using the very word that Congress has chosen, import, essentially the president is taxing importation. And I think that's the very power that, in learning resources, the court suggested, did not fall within the president's inherent authority, even if other applications of AIPA would have. Yes, Ron. The government had indicated in the tariff case that it had the inherent authority to impose the tariffs, but that didn't call the day. That's right. Okay. So the other thing I wanted to get us going down the road of, you're saying that this is a tax and not a user fee, essentially. But doctrinally, if we're looking at a limiting principle, how are we defining it? Is it because it's revenue raising? Is it because where the money is put? And maybe whether it's tethered to cost in terms of administrative fees? How do we define this so that other cases coming along this line about just putting on some amount of money, attaching it to whatever issue, that we just kind of have a limiting principle? So I think there's two pertinent lines that have been debated in this case. There's the tax versus fee line, and there's the tax versus penalty line. So if I can address both of those in order. First on tax versus fee, the line that the courts have drawn is that a fee is paid in exchange for a direct benefit. So if you want the government to do something for you, you pay a fee, that's the cost of the government doing that thing. That's not a tax, okay? A tax is the money goes to the public good, as opposed to just compensating the government for the cost of the service that's being provided. And I don't think that the government is arguing that this is a fee under that understanding, even though under something like 1356M, that might be a fee, but this $100,000 cost does not fall into that bucket. And there's a separate distinction between penalties and taxes. And I understand penalties to be punishing someone for wrongful conduct. I don't think that's even arguably at issue here. I mean, the proclamation says that the goal of the fee is to ensure that the best of the best comes to the United States. We could debate whether it'll do that, but that doesn't sound like wrongful conduct that's worthy of punishment. I am mindful of the argument by the government in this case, that the $100,000 fee will deter people from filing petitions. That is true. Some people will be deterred. That doesn't change the fact that it's a tax. And in fact, the same argument was made in learning resources. The government still has the congressional mandate of allowing the 65,000 visas into the country. Right. So, I mean, we think that there is an incompatibility there with the program, as well as the fact that Congress has set the fees at a particular amount. It just seems that this is supplanting rather than supplementing the scheme when Congress decides it's going to be $1,500, and then $500, and then $4,000 for people who use a lot of this program frequently. And the president is essentially replacing that judgment with the judgment that it should instead be $100,000. If I could just make one other point. Just on that. Yes. The president is supplementing fees in the way that any conventional exercise of 1182F would be supplementing entry restrictions. And Trump versus Hawaii says that's fine, right? You can't make arguments about the sound in field preemption or negative implication or things like that. Why would that principle be any different where the restrictions are the list of authorized fees? Well, I think that this case is quite distinguishable on its facts from Trump versus Hawaii as supplementing versus supplanting. So Trump versus Hawaii was a very clear case, as I see it, of supplementing. The statute that the challengers were relying on in that case was this visa waiver program that said that for 20% of the countries in the world, which were our nation's closest allies that met the gold standard in vetting and counterterrorism, nationals of those countries didn't need to obtain visas as long as there were reciprocal privileges. And the court held that that didn't say anything about whether extra vetting was needed for people who come from places like Iran and North Korea. And here, I think the conflict is a little clearer. Like the president is just replacing a number with a different number. Like Congress said, it's 1,500 and then 4,000 if she believes the program a lot, and there's a few other fees. And the president has decided that the number should be higher. And it's also relevant to the learning resources related argument. Like in learning resources, the court emphasized that there were other tariff statutes that show that Congress knew how to impose tariffs. And that supported the inference that regulation didn't encompass tariffs. And you can draw the exact same inference here. It's even stronger because like Congress enacted a fee for the filing of this specific document. So it clearly knew how to do that. And then you have section 212F that, you know, doesn't include anything about fees at all. Does it matter that this money is going to the general fund essentially instead of the immigration examination fee account? Yes, that's completely consistent with it being a tax that it goes to the treasury. I'd point out that same thing happened in learning resources. The funds were collected by CBP and ultimately deposited into the treasury. How should we best view your claim? Is it an APA claim? Is it an ultra virus claim? Is it an equitable constitutional claim? Is it something else? So we brought both an ultra virus claim against the president and the agencies. And we've also brought an APA claim. So I'm happy to go through both of those. How do you think that the Supreme Court viewed the claim in learning resources? So that claim was just brought under customs laws in the court of international trade. That's a separate statutory scheme to challenge the imposition of tariffs that is not directly applicable here. Of course, we filed our suit in federal district court. So the court didn't have to deal with the end of Dalton and other issues there because of the special means of review addition there. That's right. The court actually held that the court of international trade and the federal circuit had exclusive jurisdiction over that dispute. But, you know, we're relying on for our ultra virus claim, you know, circuit precedent holds in cases like chamber of commerce versus Reich and the American forest resources council case that plaintiffs are entitled to challenge bring an ultra virus claim challenging presidential action when it's being implemented by agencies. We're not seeking injunction against specific prohibition against a particular statute. That's right. We're saying that the president has exceeded his authority under section 212 F and we're not seeking an injunction against the president, which we understand is not permitted. We're saying that the agencies should be enjoined from implementing an action that exceeds presidential authority. And that's the exact theory that this court endorsed in the chamber of commerce case and in the American forest resources council case. You might recall we had some in banks recently. I have a vague recollection of that your honor. And one of the lines, one of the proposed distinctions on reviewability for an ultra virus claim was maybe if the president's action exceeded statutory authority, no review, but if there were just no complete absence of authority, then ultra virus review. If that's the relevant line, this case seems to clearly fall on the exceeds authority side of the line is 1182 F gives a lot of authority. So first of all, I don't think that's, that's the relevant line. And I don't think that's the line that was drawn in cases such as American forest resources council. I'm mindful of the in-bank case, but under current circuit precedent, I think we're allowed to argue that the president has exceeded authority. I do think that even though they're the more difficult standard, we wouldn't. I mean, let's, I'll spot you that the fact that you are ultimately challenging presidential action doesn't create a Franklin bar. I think our cases say that, but then you still have the separate question of, you know, assume the president were just the cabinet secretary. Can you get ultra virus review where it looks like an exceeding authority case rather than an absence of authority case. So I read those cases, chamber of commerce and American forest resources council to answer that question. Yes, that we can argue that the president has exceeded statutory authority. If there's a higher bar, I still think we meet it. And I think there's an absence of authority under two 12 F tax. I think that if restriction doesn't mean tax and there's just an exceeding of authority, but I don't think that's the right standard. I read the circuit precedent to say that as long as we've argued that there's an excess of statutory authority, we can challenge ultra virus action via an injunction seeking an injunction against the cabinet secretaries. We've also brought this alternative APA claim. So the board doesn't just under the APA. Yes. So, you know, I think that what happened here was final agency action. I mean, you know, CBP and USCIS as well as the state department issued this guidance that full employees of those, uh, port of those agencies or of those branches of the agencies that they are to implement this directive and that's final agency action. It's definitely final. It's an action by the agencies. I mean, it's the culmination of the decision-making process in no sense. Are the agencies still thinking about this legal consequences definitely flow from those actions. So I think the court can say that even though the agencies were implementing a presidential directive, it is still final agency action that we can challenge because if it wasn't the case, that would be, you know, it would be the end of the APA. I don't mean to be dramatic, but the government's position here is that if the president directs an agency to do something, you can't bring an ultra virus claim against the president because he's the president and you can't sue the agency either because there's no final agency action because they're just implementing what the president says. So you just can't challenge the action at all. And that would just allow the president to tell agencies to violate statutes every day and there would be no judicial review. So I take it on that theory. It doesn't matter whether the agency action does something in addition to just carbon copying what the president ordered. I don't think it matters. As your honor knows, we have explained in the brief why we think that it does in this case, that there are applications and interpretations of the executive order that the agency has accomplished. But I think that that's just the correct legal way to resolve the case is that it doesn't, I mean, the requirement of final agency action just require that it be final and be by the agency. There's no requirement of like independent exercises of discretion. But it's your position. Well, is it your position then that if we do find that it's final agency action and we resolve it under the APA, by definition, then there's no ultra-virus action because you've got an adequate alternative grounds for relief or are you saying that you have both? Well, the government has indicated that it would construe or potentially construe an action, a decision setting aside the agency action as irrelevant that the agencies would just follow the president directly. And if in fact, the agencies construe a decision that way, then the APA claim wouldn't be adequate. I do think what the court, a simple way to avoid the ultra-virus claim will be to say that under the APA, there's final agency action and the court should issue an injunction that just prevents the agency officials from implementing this illegal action and just clarify that they can't just sort of directly ignore the guidance from the agencies and sort of do what the president said anyway because that would imply, if they could do that, then we would need to have the ultra-virus action. But I think that if the court has the authority or the district court has the authority to issue an injunction under the APA that prevents the agencies from doing that, then if the court so clarifies, then we wouldn't need the ultra-virus claim. Are there no further questions? I'm 15 minutes over my time. Well, I guess I'm just trying to understand if the, under the APA, your theory would be that this is contrary to law, not arbitrary and imprecise. That's correct. And it's contrary to law because it is contrary to a statute or contrary to the constitution. Contrary to a statute. We would say that section 212 acts authority to restrict entry, which is being implemented by the relevant secretaries, does not encompass the power to demand $100,000. So if it's articulated that way, where you're not saying it's contrary to, articulated that way, it sounds very much like just purely exceeding statutory authority, as opposed to there is another statute out here that we have identified that prohibits this action and what the president has done falls within the meets and bounds of that statute. And so there's kind of an affirmative statute that prohibits what the president can do. You can call it the absence of authority, I guess. I understand that there's no statute that says thou shall not tax, but I mean, agencies need authority to do everything that they do. And if there's just an absence of act, that's just as contrary to laws would be if a statute said thou shall not issue this tax, plus the fact that there are other statutes that specifically impose fees at a much lower rate. And I think that the implication of those statutes is that that's the rate, that's the number, that's the cost of an H-1B petition. And so I think it's affirmatively inconsistent with those laws to say that number will be replaced by a different number. I guess what I'm trying to to drill down on is doctrinally how to understand what we would be doing if we rule in your favor. Because on the one hand, you say, well, this isn't an arbitrary and capricious case. This isn't a case where we are kind of reviewing the president's exercise of discretion. It's a case where the president is acting in excess of his authority. But the statute that you are referring to is one that says that the president may impose on the entry of aliens any restrictions he may deem to be appropriate. And so deemed to be appropriate, that's like language that explicitly confers discretion. And so your argument seems to be that he shouldn't be able to deem this sort of a restriction to be appropriate. I don't think that's our argument. I think our argument is that this isn't a restriction. And maybe an analogy would be helpful. There's a case in which the court denied a stay, and it's currently pending for a merits panel, this RAICES case, about Section 212F as well, in which the state panel concluded that at least as to removals, Section 212F didn't give the president the discretion to remove certain individuals. It's just exceeding the president's authority, right? Like, you know, the president has lots of authority, but he doesn't have the authority to remove because it only applies to entry. So it's an excess of authority. It's not abusing discretion. It's just exercising power the statute doesn't give. And that's in the nature of the claim we're bringing today, right? It's true that there's broad discretion, as shall be necessary, exactly the same way that IEPA had virtually unlimited discretion in licenses, instructions, or otherwise. So essentially, the president can act by any means necessary, but like, act to do what, right? And so the court held that regulate, which could be done by any means necessary, just didn't encompass the power to tax. And all we're asking the court to do is say the same thing here. A restriction does not, it's just a tax is not a restriction in the same way that a removal is not entry. And so it's really an excess of authority claim. It's not merely a claim of an abuse of discretion or arbitrary and capricious reasoning. And Congress has not granted the power to tax under the statute. That's right. We agree that Congress could confer this authority expressly if it wanted to. It just hasn't done that. All right. Thank you. We'll give you time. A quick question. Yes, I'm sorry. Just back to Judge Wilkins' earlier discussion with you about, does it matter the amount, you know, with respect to the number? Because I'm concerned about whether or not, is there any number that as long as it exceeds cost recovery, is that sufficient? Or does it matter about it just being a tax regardless of that amount? I think our core argument is that it's a tax. It would be very hard to draw lines in the statute saying, you know, $10,000 is okay and $50,000 is not. I think the relevant legal line is tax versus non-tax. Okay. So if the proclamation said it's a dollar, your position would be the same? You can't do it? I'll take the hard line position, Your Honor, that it would be the same. I mean, our case is easier that it's $100,000. But, you know, I'm going to say that the statute doesn't authorize a tax and we're not trying to draw that line. I mean, the higher the prohibition, the higher the exaction, the more this approximates a prohibition than an exaction on a lawful transaction. Yes, it's true that, you know, as the cost gets higher, fewer people will do it. And if I de-functional analysis of tax or no tax, the size of it cuts against you. I mean, in the tariffs case, you know, the stated purpose of the tariffs was to remedy trade deficits, so to deter people from engaging in the action at all. I was struck by the Solicitor General's statement at the learning resources oral argument in which he said that the tariffs would be by far the most effective if nobody ever pays them. In other words, the asserted goal of the tariffs, according to the executive, was not to raise revenue but to deter trade. Of course, it did raise some revenue and the court said, therefore, it's tax. In this case, it's hard to predict how many people are going to pay the $100,000. You know, some will, some won't. But, you know, it deters conduct and raises revenue, and that's very typical among taxes. We see that with excise taxes for alcohol and tobacco. You know, some people don't use it at all, and then some people pay, and it's tax. And I think that this can be understood the same way. Even though it doesn't appear on your tax forms, not collected through the IRS, all the functional considerations. That's exactly what the government said in learning resources, which also, you know, the tariffs there did not appear on tax forms. It was collected by CBP. Lots of taxes collected by the government are not collected by the Internal Revenue Service. You know, alcohol and cigarette taxes are collected by the ATF. You know, there's just no rule that says that, you know, something has to be collected by the IRS to be a tax. I mean, Congress called this the importation. But, you know, there's still NFIB and the child labor tax case, which say that... I think at some point, functional considerations will... You know, the child labor case, and I realize I'm way over time, but that had many features that are absent here. For example, that case had a mens rea requirement that was absent here, which, you know, the court in NFIB interpreted to be, you know, redolent of wrongful conduct because, you know, mens rea requirements generally appear in criminal laws. No employer unknowingly brings an H-1B alien into the country. I know, but the point is there's this explicit sienta requirement that they have to know the person was under 18, which implies that people were acting more wrongly, you know, if they knew versus if they didn't know, which implies that the conduct was wrongful. And it's not just that. Like in this case, the proclamation says that the goal is to ensure the best of the best come in. In other words, the idea was if someone is really worth $100,000, then that's, you know, a great person we want in this country. Again, you can debate that policy goal, but that just doesn't sound like a penalty at all. That's almost like a reward for bringing in people that, you know, the executive should be here. I mean, maybe we're, maybe we've covered this. It sounds to me like an exercise of the immigration authority. Well, as I said, the president has, but I take your point. All right. Thank you.  May I please the court, Tiberius Davis on behalf of the United States. The court should affirm that the Bloor court's well-reasoned decision from Judge Howell for numerous reasons. Much of what the court discussed with opposing counsel today was whether this payment requirement under the proclamation is a tax, and if so, whether it's delegated properly under 1182 F after learning resources. But Judge Howell did not have the learning resources case available to her. Yeah, that's correct, your honor. But I think for a couple of reasons, learning resources actually cuts in our favor. And I think part of that goes to what Judge Katsas was saying. So the only majority opinion there was for the textual analysis of AIPA. And the Supreme Court made very clear that they were not touching any other statutes or interpreting any other statutes in response to Justice Kavanaugh's dissent. And the language there was regulation of importations. And they said it was separated by 16 other words. As Judge Katsas pointed out, the Supreme Court said those other words, those other verbs are actually limiting on what it could do. These are the types of things you can do and nothing else. Here in 1182 F, there is no list of verbs or limits on what the president can do. He can suspend the entry of any aliens, or he can impose on the entry of aliens, any restrictions he may deem appropriate. But you still have to have the power to tax. And I think a couple of responses, your honor, which we can get to in more depth. First, I don't think it's a tax for the Sebelius reasons that Judge Katsas was going over. And because I think this can be seen as a power under the immigration authority. But even if it is a tax- The argument that you all articulated? Yeah. Yes. We certainly said that it is under Sebelius, not a tax. First, because Sebelius was a functional test. Nothing is dispositive. Obviously, there they said a label was not dispositive. But in both there and learning resources, one of the core features of the tax was to raise revenue. The individual mandate did raise revenue. The tariffs did raise revenue. Here, this is not in the record below, but it's in the record in the other cases, because we found this out later. So far, the proclamation has reduced revenue. Because its purpose is to restrict entry, not to raise revenue. Also, in NFIB versus Sebelius, they talked about the fact that the IRS was collecting it versus the child tax in Drexel was taken by labor. Here, it's USCIS. There they said the individual mandate- You can't really say the purpose was to reduce revenue, though, because if there are people who wish to pay it, then you're raising revenue. The purpose wasn't to reduce revenue, but it wasn't to raise revenue. And in effect, it also is not raising revenue. The purpose was to restrict entry for a class of aliens that were harming the national interest in the American workers. And I think that that is, again, if you look at who's collecting it, the purpose, the effect- So what are you calling it? I think, as Judge Katz has pointed out, there were a set of payments for head counts on immigrants. And I think this is similar to a head count payment. And I actually think by opposing counsel's cases- That's what I have in a statute, a head count payment. So what are you calling this? Is it a fee? Is it a tax? Is it a penalty? I think it is a head count. I think it's a restriction. I think it's a payment restriction. And you could call it a fee, I suppose. But I don't really know that, just like in Sebelius, the label really matters. It's where this power comes from. And I think opposing counsel's- The label still doesn't matter if it's really a tax, too. No, that's true. But that's why I think it's a functional test under Sebelius. And if you look at those, all those factors cut against this being a tax. I mean, plaintiff's entire argument is that this is so prohibitory that it's ruinous to some of them. Again, if you look at Sebelius, that counts in favor of it not being a tax. Because in Sebelius, the individual mandate could not be more than the insurance that it was requiring you to get. The government's collecting money. It's going to the general fund. Why isn't that raising the revenue? Because it's reducing the amount of people petitioning and paying the other fees. And so it's reducing the amount of revenue- One employer pays it. You've raised revenue. I think that that would mean that there's- everything's a tax. It's a payment requirement, and we know that's not the case. Not necessarily. If I go and try to get a passport, I'm paying a fee to get the passport. That's not a tax. But it raises revenue, in a sense, by the same logic. So that's why I'm saying I don't think the fact that it raises revenue individually matters. And especially here, the entire proclamation is not raising revenue, in effect. And I think that the second point for why it's is, is this really a power under some other authority? I think this is under the immigration authority. I think Knopf makes clear that that is an inherent part of the executive. Obviously, we're not saying Congress has no role, but Congress expressly delegated what the Supreme Court and Justice Ruth Bader Ginsburg, when she was on this court, has called sweeping. And I think Plaintiff's own cases, Smith and some of the other cases, actually prove this point. Because there, they said a state could not put a headcount tax, what they called a headcount payment, on immigrants coming in. And they said that was because it violated the Commerce Clause. They cite to one justice who said it was also a taxing problem, but it was not at all clear that any other of the justices joined that. In fact, they couldn't agree whether to call it a tax or not. So just like in learning resources, was there any specific statute that you could identify that says the power to regulate includes the power to tax? So I think that the delegation here, based on learning resources, is sweeping enough that any restrictions he may deem appropriate can encompass a tax, even if you think it's a tax. And I think learning resources makes that clear. Because again, that was looking at a specific statute, AIPA, that said regulate importations, separated by 16 words. The Supreme Court distinguished that case explicitly from Algonquin, as Judge Katz has pointed out. And the statute there didn't use the words tariffs. It didn't expressly use the words necessary to adjust imports. And they said that in learning resources, they said that language, that delegation was sweeping. They used the exact same word to describe 1182F in Hawaii. They said it's a sweeping delegation. It's facially broad. It's a comprehensive delegation. So I think that any restrictions, and again, as Judge Howell correctly found, based on the long line of cases, any is a broadener. So restrictions, any restrictions can include a payment restriction on the entry of aliens here. And again, I think— Where does the $100,000 number even come from? I think, well, the President has wide discretion to set what restrictions he deems appropriate. Supreme Court has made that clear in Hawaii. And the idea behind it is, if the companies really want this person, this person's really important, they'll pay to have them come in, but— They're paying them to come in at a number that they not necessarily would even get paid in salary or wages. Right, because part of the idea, and this, I think it's at JA-410, has been shown to work, because the idea is, well, if they're not actually worth that much, then you will hire an American worker and train them up. And one of the Chamber's own members, I believe, again, this is at JA-410, they said, well, we can't find an American to do this. We really need somebody from abroad to do it. And in the tendency of litigation, they hired and trained up an American engineer for that important job. So that's the point of the proclamation. That's why the number is set there. Obviously, you know, the number could be higher or lower, but the president at some point has to draw a line, and he has broad discretion to draw it there. Oh, go ahead. Are you done? Yes. Suppose I think that this is both a tax and the exaction could be constitutionally justified as an Article I, Section 8, Clause 1 tax or a Clause 4 immigration restriction. It's both. Then what, for purposes of downstream questions about clear statement rule and president's authority and such? So I think if you buy some of plaintiff's arguments that there's this special clear statement rule for taxes, it makes it easier if you put it into the immigration bucket or a commerce bucket, because it sort of gets rid of that. Why does it have to be one or the other? The powers are overlapping. I don't necessarily think it does. I think it can be both. You know, you have an argument that it's not a tax at all based on NFIB, but who knows? I mean, NFIB took something that was formally a penalty and recharacterized it as a tax based on functional considerations, which just says the taxing power is broad. So I don't know if you win the NFIB issue or not. Right. I think the functional test obviously cuts in our favor here, looking at the same things. I think this could be, even if it is a tax, it's within the delegation. And I think if you accept plaintiff's arguments that there has to be some special clear statement rule for taxing, then the fact that it's also under the immigration power that also, as Facito from the Ninth Circuit just said, as your own court's opinion and Racy's also acknowledge, the president has some inherent authority here, especially it's at its maximum when the Congress delegated clearly here an authority to impose any restrictions. Now, I don't think there is some special clear statement rule here. Both Skinner and FCC versus Congressional Research make clear that there's not a special delegation rule for tax. Tax doesn't suddenly get a special rule for it. There's not a heightened standard for purposes of the non-delegation doctrine. But that's a slightly different question from how clearly Congress has to speak in order to make the delegation. Learning Resources says if it's a tariff, which is a certain kind of tax, Congress has to speak clearly. And Skinner says Congress has to speak clearly if it's a tax or a fee. Maybe. Yeah, I don't quite agree with that in this sense, Your Honor, because I think the logic of why there's not a special delegation principle for intelligible principles is the exact same reason why there wouldn't require a clearer statement. I agree with that as a matter of first principles, but it seems squarely settled. No special rule for non-delegation, but, you know, you've got the language in Skinner and the language in Learning Resources suggesting there is a special rule for at least some kind of taxes. I don't read either case to say that there's a special clear statement rule. I think it's just that any delegation has to be clear. Learning Resources says for taxes that are tariffs. I mean, that's a hard one to fight. I'm not sure that I agree with that characterization, but, again, tariffs are sort of core historical taxes. That's at the founding, as the Supreme Court pointed out, what started the Boston Tea Party and was sort of the core way that they were raising funds. Obviously, not the case here, where you have the intersection, as Your Honor pointed out, with immigration, with foreign affairs. But I would also point to, in Skinner, they also point to Algonquin, and they say Algonquin is clear. And, again, if we look at Algonquin, that's about... That takes you to whether Congress met a clear statement requirement, not whether there is a clear statement requirement. So I think that that shows that in Algonquin, the statement there, which, again, didn't expressly say duties, taxes, imposed or tariffs, was sufficiently clear to give the tariff authority. And if you look at the language in that statute, it's nearly identical to the language here. Right there, they said, he can adjust importation as he deems necessary. Here, it's any restrictions as he deems appropriate. Again, in Learning Resources, they describe that language and distinguishing it as a sweeping delegation. Hawaii and Ruth Bader Ginsburg, when she was on this court in the Boersiak, said this is a sweeping delegation. So I think it's well encompassed within that authority. I also think the other part that the court looked at in Learning Resources was what authority is being asserted here under IEBA. And they said, and we disagree with their characterization, but they said, well, this is a sweeping authority because it's to raise as many tariffs on as many countries for as long as you want, as high as you want. And they said that the statute, the text couldn't bear that weight. Here, the proclamation, it's time limited. It's only for a year. It's only on H-1B petitions. It's only on the entry of aliens. And a lot of those limits stem from 1182-F itself. It's not just this proclamation. It has to be time limited, as this court pointed out in Racy's. Again, we don't necessarily disagree, but there is precedent to say it's only an entry restriction on aliens. So it's- What about your friend on the other side's argument that we should look at, I think it's section 1184 that talks about this in terms of importation of an alien. And so that tells us that a fee like this should really be seen as a tariff. I'm not sure that that necessarily follows. I think, again, restriction is broad enough, especially modified by any, to include different types of fees, taxes, if the court considers it to be such. And I think, you know, even if you look at their definitions, their definitions below included, it's a condition, it's a, you know, limit. I think there are a lot of definitions for restriction that include that. And then take them around and say, well, this isn't actually completely banning their entry because if they pay, they can come in or they can come in other ways. But that is basically just a suspension and it reads out any restrictions language. I think any restriction or a condition, as they have defined it below, is that it can be satisfied. And so it is a restriction on entry, but it can be satisfied if that payment's there. I think that is well within the heartland of 1182-F. And just another moment on the power being asserted here. Again, 1182-F has these restrictions in it and the proclamation reflects those. And in learning resources, the Supreme Court contrasted that with Yoshida, which was the predecessor statute to IEBA. And in Yoshida, Nixon was allowed to impose a tariff and they said, well, there, it was limited in time and scope. Again, this is limited in time and scope. Sorry, why does that matter? That might matter as a trigger for the major questions doctrine, but that wasn't the majority's rationale. The majority's rationale is more just this threshold cleaner question of tax or no tax. Yes, I agree with that. Obviously, the opposing counsel has argued the major question doctrine in this court. The district court said it didn't argue it below and waived and that's reviewed for abuse of discretion. But if we're assuming major question doctrine- We can't waive an interpretive principle. So I'm not sure that I agree with that, Your Honor, in this sense. If you buy the Justice Constitutional Doctrine, I do think you can waive that. And I think it's also telling that there's been a lot of cases interpreting- This is an avoidance doctrine. You can't waive an avoidance doctrine. Well, I don't know that I agree with that, Your Honor, because there's been a lot of cases interpreting 1182F saying this is way too broad. Hawaii, if you buy the Supreme Court, there's been a major question doctrine before Hawaii and they didn't use the major questions doctrine. If you look at the CEDAW just from the Ninth Circuit, they didn't use the major arguments there. So I do think it can be waived. But if you buy the- I take your point. It's a defensive point for you defending against major questions, but it doesn't really help you on tax versus something else. Well, so I think there's a couple of layers. Whether it's a tax or not, and I think there's a Sebelius point. I think there's also it can be under other authorities, even if it might be a tax. There's a point of whether this delegation is sufficient or not. That's sort of the Algonquin point and how broad Hawaii reads it. And then I think there's a point of, well, should you maybe read it narrower if you use the major questions doctrine? And I think you shouldn't use it, but even if you do, the court starts- and again, there's not a majority opinion for this in learning resources- but the court starts with the text, the context, and then as Justice Barrett said in Biden versus Nebraska, is there a mismatch between that text and the power? So I think that's where the PowerPoint comes in. Is there any major questions doctrine here, though? I don't think you do need to get into it, Your Honor. Again, I think it's waived. And I think in any event, it doesn't change the analysis for the same reasons. And, you know, in learning resources, the government conceded there was a $15 trillion impact. There's no evidence of that here. Now, plaintiffs argue about the history that there hasn't been something like this from previous proclamations. They made the exact same argument in Trump versus why, that there hadn't been a proclamation like this before. And the Supreme Court said that's not a D2M. I just briefly want to point to their argument about whether this is overriding the H-1B provisions or the fee provisions. This exact same argument came up in Posito from the Ninth Circuit that just came out. There, the proclamation suspended, according to some, indefinitely, the refugee program, which also has a very reticulated scheme. It has a cap. Judge Childs, as you were talking about for H-1B, had a similar cap there. The plaintiffs argued you're overriding the refugee program by suspending all entry. And you know Congress wants some people to come in because there's a cap. And the Ninth Circuit said no. The Supreme Court made clear that 1182F provides ample power to add restrictions in addition to. And that includes a suspension of the refugee program. And then they said it's not really overriding it because there's exceptions. And at some point, it will lapse. Here, there are exceptions. And even more so, as Judge Howell pointed out, the provisions for H-1B are all still in place. People can still petition. If they meet the qualifications of a specialized knowledge and skill, they can still come in. The same exact people can. There's just a payment restriction in addition. And all of the fees that they point to still exist. They're all still being collected. But they serve different purposes. And none of them directly conflict with the proclamation's payment here, nor are In fact, some of them, the fraud fee and the premium fee, which is 1356U, say that they're in addition to other fees that can be charged. And so then we just get back to the question of like, okay, does 1182F allow for this type of payment? And if it does, it's certainly not preclusive that there are other fees that can be charged under the statute. I don't recall the Ninth Circuit case that came down after the briefing. It did. It came down on 28-J. We filed a 28-J yesterday. The response of 28-J did not respond at all to this argument that it rejects their position that the proclamation overrides H-1B and overrides the fees. Their only response was, well, that's just not really relevant because this is really about a tax. So I think that just comes back to the point that all their arguments boil down to whether this is an impermissible tax or not. And you can sort of put the other stuff aside. And if the court, I'm well over my time, but if the court wants to talk about sort of the reviewability stuff, I'm happy to talk about that. Any questions? Go ahead. Well, what is your position with respect to whether this is reviewable at all? So we don't think it is reviewable at all. And that's not to say that nothing is ever reviewable if the president directs it. So let's start with consular non-reviewability. This is about the entry of aliens. It intersects with separation of powers. So we think consular non-reviewability applies there. Reviewing a particular decision by a consular. I agree. But I read Peterson, for example, to be about an agency manual decision there. But this, I think, is different. And I think a lot of the things that plaintiffs cite to is different because Congress expressly gave this authority to the president in his discretion. This isn't just a peer agency action. This is about the president's power that Congress gave to him. And so I think in that case, this consular non-reviewability still applies. And the core consular non-reviewability is separation of powers and the fact that aliens have no right to enter. That still applies here. And I think the fact that it sets a general rule doesn't change that. If you look at Lopez, if you look at even this court's stay decision in Bracey's, which stayed the injunction against an asylum restriction, you can make general rules to sort of guide discretion, especially when it's given to the president. And then I think if you look at Ultravirez, we think that the Ultravirez standard under Dalton v. Specter, this is just as, and Webster v. Doe, this is just as discretionary. There's just as much deference here as there was there. We also think that there's no specific prohibition, and plaintiffs have never pointed to one, under the Nuclear Regulatory Commission. They try to say that that's only about implied judicial review bars, but Global Health was about the Impoundment Control Act, used the exact same test, said nothing about implied preclusion of review at all. But even under the normal Ultravirez test, that's still quite a high bar we don't think they've met. Again, that's not to say that there couldn't be a situation where 1182F is used and it's so far outside the power that it could meet the Ultravirez bar. What would that be, though? I don't understand what the limiting principle is of when anything would be reviewable under your position. So I think one example this court did in this day, which again we respectfully disagree with, but said that the removal restrictions in RACIs was so far outside of the scope, because 1182 says entry and that's removal. So that arguably, we didn't argue Ultravirez wasn't a cause of action there, for example, I don't think in the Court of Appeals. Another example is if they were just targeting domestic, you know, trying to do something to domestic employers. Maybe they imposed a vaccine mandate on domestic employers. Well, that clearly has nothing to do with 1182F. So I think those things could be reviewable. And I think under the APA, our position is actually much narrower than what plaintiffs say. If you look at Detroit International Bridge, and I understand these are lower court decisions, but there's a lot of them saying that when the president has the authority and the agencies are just implementing it, you can't review the agency implementations or else that's just a circumvention of Franklin. Because, of course, the president has to rely on agencies to carry things out. Even Selah Law says that. And so here, he's just telling them this is what the proclamation is, this is the power Congress gave me, and they're ministerially implementing it. But if what the executive order or proclamation is doing is telling them to use their own discretionary authority, or they are using their discretionary authority outside of what the proclamation says, that piece would be reviewable as a separate final agency action. But I actually do think this goes to the APA, because the APA for final agency action requires the culmination of a decision. But the agencies don't make any decisions. They have to follow the proclamation, and they have to follow it because Congress gave the president that power. This isn't the same where it's an executive order telling, as here, the Department of Labor to start rulemaking for the prevailing wage. You can't skirt the prevailing wage rulemaking requirement through an executive order. The agency still has to do it. The agency is doing it, and that can be challenged. But the mere implementation of proclamation itself cannot be challenged. And I think, otherwise, you just complete end-run around limits of reviewing presidential actions. So I think there are things that can be reviewed, but I think this is sort of in a band where there is no review. And as the DDC courts have said, it's a pretty narrow band. But what about allows presidential actions to be reviewed? What was that, Your Honor? Global health allows presidential actions to be reviewed. Certain presidential actions, and again, they rejected Voltervera's cause of action there for many of the same reasons we point out. But I think, again, it depends whether the president has the authority himself and if they're just ministerially implementing it. Now, they suddenly try to say that it's not ministerially implementing it because this only applies after enactment. It doesn't apply to a change in status of people within the United States. But that's on the face of the proclamation. If you look at Section 2 and 3, it says that it restricts entry or attempted entry of aliens into the nation after the effective date. So by its nature, it's an entry restriction. It's not going to apply to people who are already in the United States seeking a change of status and extension. Those people haven't been charged the fee. And that also shows it's an entry restriction because if you're in the United States, you can still apply for an H-1B the exact same way you have before. Okay. Just back to global health. It says presidential action may be reviewed through APA challenges to final agency action by subordinates implementing the president's directives where such review is not otherwise precluded. Again, Your Honor, I read that to be referring to situations where they have some sort of discretion or where the executive order and executive direction is not necessarily the force of law in and of itself. There are plenty of EOs that direct agencies to take out actions or to implement rulemaking. In fact, again, this proclamation tells the Department of Labor to implement rulemaking. That sort of stuff could be challenged. But what's unique about 1182-F is that it gives the president himself power to make these decisions when he finds in his determination any restrictions he deems appropriate. It exudes deference to the president in every clause, as the Supreme Court has said. And I think in those circumstances, that can't be reviewed if all the agency is doing is implementing. If they're going beyond it, if they're doing something extra, that could be challenged. Now, plaintiffs tried to say exceptions are extra. They didn't argue that below. And the district court in the transcript went at them for not making that argument. But they tried to say every use of the proclamation is a decision not to use an exception. That's not how the exceptions work. You have to ask for the exception. But even so, those would then be separate final agency actions. And you could challenge those decisions individually. But that's not a backdoor to take down the entire proclamation. In Youngstown, the only thing the Secretary of the Interior was doing was implementing the president's order to seize the steel mills. You think that's unreviewable post-Franklin? I don't think so. Because again, there, the president just had no authority. But here, Congress did delegate expressly the authority of 1182-F. So that just gets back to our first question of this case. And I think in that case, when the president has the power and the discretion... You're putting a lot of weight on the fact that the action here is presidential. I'm putting a lot of weight on the fact that the president's action has the force of law because Congress gave him that power. I think just because the president tells the agency to do something and it has no basis in law, or the thing he's telling them to do is actually that agency or to that department, then that can be reviewable. But here, where it's the president's authority itself, I think that's where it can't be reviewable just because they implement it. As Tulare pointed out... I mean, maybe, but it sounds like you're blurring the line a little bit between whether the action is reviewable at all or whether it's reviewable but not ultra-virus because the president has some authority and Congress has given him other authority. That sounds like you're sort of doing some form of ultra-virus review and it failed. The claim, the challenge fails. So I think there are circumstances where there can be... Well, so I think you've got the Dalton Specter issue here of the amount of discretion that is given to the president, which I think this is just like Webster versus Doe. This is about as discretionary as you can get. But again, I think there can be ultra-virus claims even for 1182-F if it's just so outside the bounds. And I think that this, obviously, as we've been debating, I think it's pretty clear as well within the delegation, but it's at least a close call and that's not within ultra-virus. That's really the point there. I'm well over my time, so if there's any further questions... Thank you. All right. Mr. Unikowski, we'll give you three minutes. Thank you, Your Honor. I would just like to address the colloquy between Judge Katsas and counsel of what happens if the power at issue implicates two different grants of authority to the Congress. So in other words, suppose Congress had hypothetically enacted this $100,000 tax. Suppose we would stipulate, I would debate that, but suppose we stipulate that that falls both within Congress's power to tax and authority over immigration. How should we think about that in this case? So I think that doctrinally, I think learning resources and Skinner just answer this question. So in learning resources, I just think it is the case that the tariffs, had they been enacted by the Congress, would have been a permissible exercise of its authority over foreign Congress, not just the tax and authority. It's classic foreign Congress imposing a fee on bringing goods from foreign countries into this country. So it's a classic exercise of the foreign Congress power, but yes, Your Honor. Which tends to show that the solicitor general's concession might've been ill-advised, but he made the concession and the court decided the case on the assumption that there was no other power at issue. I'm not sure I would, I don't think the court decided that case under that assumption. Okay. I think the court concluded that it was an exercise of the power to tax, but I don't think the court was really saying that this could not hypothetically have been enacted under another source of law. At least I don't read the court. I don't think it could have reached that conclusion. It was silent on whether there was another article one, section eight power to express in taking article two powers off the board. That's right. That's exactly what we're saying in this case, right? I mean, we're talking about different article one powers here, the article one power over immigration and the article one power over taxes. And just layer in the article two power to control entry, just to help me, I mean, I think it's all three. Okay. So I don't think that this is, so I don't think that the ability to impose taxes inherent exercise of the president's article two power in the same way as in learning resources itself, there is inherent authority to prevent, you know, dangerous items in cases of emergency from entering the United States, but that doesn't imply a power to tax the entry of those items. So that's the article two one I'd suggest. I'd also just, even under article two, you know, it's still seizure type of case. I mean, here, section 212F, you know, it's a reticulated granted power. It's very broad, but it's broad within its domain and it applies to restrictions. And Congress has enacted lots of other statutes specifically addressing fees, which was the same overall structure that we saw in the learning resources case. The court was struck by the fact that even if in the abstract, you might think that the ability to impose tariffs was an exercise of some form of inherent presidential authority in cases of national emergencies, Congress had spoken clearly enacting these carefully reticulated tariff statutes elsewhere. And there's also this historical issue that we haven't really explored much today that, you know, the power had never been exercised under the IEPA. And so based on all those inferences, the court concluded that IEPA didn't confer the tariff authority and the arguments map on quite effectively here. I see my time. Yes, sorry. Focus more on, you know, the constitutional powers and assume we're, you know, at the mid, in the middle, the area of the Venn diagram. Because to me, your argument based on no authority because this is a tax, to me is stronger than your argument. This conflicts with the reticulated scheme and the statute. I accept that, your Honor. So let's first talk about the overlapping Article I authorities. Right. Okay. So in addition to the fact that learning resources case, which I think clearly involved overlapping Article I authorities, that was also the case, I think, in Skinner. There's this very clear language in Skinner that says that any tax or fee other than a pure fee for a direct benefit is subject to this clear statement rule. And I don't think you can read that as saying that that's only taxes that fall within the Article I authority, because it seems to say that even things that aren't taxes would be subject to the same fee. Right. And I think that makes sense, not only just looking at the specific facts of those cases, but also, you know, for good practical reasons. Because even if we accept that the power to charge for entry is in some abstract sense, an exercise of Article I authority over immigration, if Congress had decided to enact such a statute, it's still of a very different character than a Article I powers, rather than one, even under the assumption that it falls within the immigration authority. And so the question is whether Congress would have, you know, silently delegated to congressional powers by a statute that seems to only refer to one of them, which is the authority to restrict entry. And so, you know, I think there are good practical reasons to say that if Congress wants to also delegate the taxing authority, there's got to be some clear language there, especially since historically, the President hasn't understood it this way. I mean, you know, was enacted in 1952, 74 years ago. And, you know, there have been many opportunities to use it as a revenue-raising statute, but it's never been exercised that way. And again, I think the historical argument is actually stronger than in learning resources, where there was this argument about the Yoshida case. So I think that if you just take all the successful arguments in learning resources, they apply more strongly to this fact pattern. Thank you. Thank you. Case is submitted.
judges: Wilkins; Katsas; Childs